UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| **RESPONSIVE INNOVATIONS, LLC., ET AL.,** | ) ) ) | **CASE NO.4:08CV1184** |
| Plaintiff, | ) ) | **JUDGE CHRISTOPHER A. BOYKO** |
| Vs. | ) ) | |
| **HOLTZBRINCK PUBLISHERS, LLC., ET AL.,** | ) ) ) | **ORDER** |
| Defendant. | ) | |

**CHRISTOPHER A. BOYKO, J:**

This matter is before the Court on Defendants' Motion in Limine to Exclude Plaintiffs' Expert Andrew Carter (ECF # 168). For the following reasons, the Court denies the motion.

Defendants seek to exclude the testimony of Plaintiffs' damages expert, Andrew Carter, because Carter's testimony is unreliable under the Federal Rules of Evidence and *Daubert*. According to Defendants, Carter offers opinions on damages using three separate damage calculation theories, all of which are flawed.

According to Defendants, under Carter's Lost Profits theory, Carter failed to consider alternative non-infringing designs available to Defendants. Defendants contend that if there exists acceptable alternatives in the relevant market to Plaintiffs' device then Plaintiffs cannot show lost profits. In other words, if some other competitor's product would likely have been purchased instead of the alleged infringer's product or Plaintiffs', then Plaintiffs cannot show lost profits because the alleged lost sale would have been captured by another competitor.

Defendants further contend Carter did not take into account potential or actual design-

arounds implemented by Defendants in 2011.[1]

Defendants contend Carter's lost profits analysis failed to consider sales of non-infringing products available during the relevant damages period. Carter's lost profits analysis assumes all Defendants' sales would have been obtained by Plaintiffs, but for the alleged infringement, without considering that other competitors would likely have captured a portion of Defendants' sales. Defendants point to the testimony of Plaintiff Turning Technologies CEO Matthew Broderick, who testified that several third party companies sold competitive audience response systems in the relevant U.S. higher education market, including eInstruction, Qwizdom, SMART, and H-ITT, amongst others. In 2008, third party competitors made up over 50% of the sales in the relevant market and in 2012 they made up over 10%. Broderick further stated that Turning would have made over half the sales obtained by Defendants. This figure is substantially less than Carter's estimate. Therefore, Carter's failure to account for competitors' sales demonstrates that his lost profits analysis is unreliable.

Carter's analysis also failed to consider whether competitor's devices infringed or did not infringe and failed to conduct a market survey to indicate what customers would likely have looked for when purchasing an audience response system. Carter also failed to consider the i>Clicker price and features when comparing it to the relevant market to determine lost profits. Defendants' i>Clicker is priced lower than competitor's products and has less features.

Defendants also argue Carter's royalty rate analysis is unreliable because he never articulated how he arrived at an 8% royalty figure. While Carter did consider the 15 factors used

---

[1] Because there is a separate motion by Plaintiffs concerning Defendants' design-around argument, the Court will discuss this issue in depth in a later opinion.

to establish a reasonable royalty rate under the hypothetical method found in *Georgia–Pacific Corp. v. United States Plywood Corp.,* 318 F.Supp. 1116, 1120 (S.D.N.Y.1970), he never provides support for an 8% figure. Instead, he relies on a vague "totality of the circumstances" conclusion to support the figure. Because this figure is arbitrary and not based on facts, Defendants contend it is unreliable.

Lastly, Defendants contend Carter's market share analysis is unreliable because he relies on data compiled by a company called Futuresource. Futuresource's data is flawed because its market share estimates come from data supplied by self-reporting market participants and not from its own market data. Defendants own data was never included in Futuresources data until Plaintiffs contacted Futuresource to report that Defendants were the second largest market participant.

Plaintiffs argue that all that is required for a plaintiff to prove there was no acceptable non-infringing alternative is to show there is no next best available alternative. Carter, at section 9.2 of his Report examined relevant alternatives in the audience response system's market. His report then discussed why those competing products were not relevant based on the differences between them and the i>Clicker and the '716 patent. Also, Defendants contention that Carter failed to consider price and feature differences amongst the alleged relevant alternatives goes to weight, not reliability, even though Carter did consider such items.

Carter arrived at his 8% royalty figure by appropriately applying the 15 *Georgia Pacific* factors and applied both a quantitative and qualitative analysis.

Finally, Plaintiffs argue that Futuresource's data is reliable because Futuresource is a specialist research firm providing market data relating to a number of fields, including the

3

audience response field and the Federal Rules of Evidence permit an expert to rely on such data. Defendants' own CFO attested to Futuresource's reliability and Defendants' expert Den Uyl relies in part on Futuresource data in his own report. Carter independently verified Futuresource data by confirming the source of the data was the suppliers in the audience response market and not third party sources. Carter further confirmed the data by conducting a reasonableness test using actual sales for the i>Clicker.

## Law and Analysis

In *Panduit Corp. v. Stahlin Bros. Fibre Works, Inc.,* 575 F.2d 1152 (6th Cir.1978), the Sixth Circuit established a four factor test to establish lost profits. "The *Panduit* test requires that a patentee establish: (1) demand for the patented product; (2) absence of acceptable non-infringing substitutes; (3) manufacturing and marketing capability to exploit the demand; and (4) the amount of the profit it would have made." *National Research Laboratories v. Eppert Oil Co., Inc.* 104 F.Supp.2d 851, 857 (S.D.Ohio,2000). "In order to receive lost profits, a successful plaintiff must establish actual damages." *Id at 856. Citing Oiness v. Walgreen Co.,* 88 F.3d 1025, 1029 (Fed.Cir.1996). "Proof of actual damages must include a causal connection between the infringement and the lost profits. 'To recover lost profits as actual damages, a patent holder must demonstrate that there was a reasonable probability that, but for the infringement, it would have made the infringer's sales.' " *Id.* " An accurate reconstruction of the hypothetical "but for" market takes into account any alternatives available to the infringer. " *Grain Processing Corp. v. American Maize–Prods.,* 185 F.3d 1341, 1351 (Fed.Cir.1999).

"A patentee need not negate every possibility that the purchaser might not have purchased a product other than its own, absent the infringement. The patentee need only show

that there was a reasonable probability that the sales would have been made "but for" the infringement. When the patentee establishes the reasonableness of this inference, *e.g.,* by satisfying the *Panduit* test, it has sustained the burden of proving entitlement to lost profits due to the infringing sales. The burden then shifts to the infringer to show that the inference is unreasonable for some or all of the lost sales." *National Research* at 856.

  The Court holds Andrew Carter may testify on those topics contained in his report relating to lost profits, royalty rate and market share.  Carter is undisputedly qualified based on his education and experience, the testimony is based on sufficient facts and data, is the product of reliable principles and methods and Carter has reliably applied those methods to the facts.  There is also no evidence that the data relied on is inadmissible.

  There is no challenge made to Carter's qualifications as a Certified Public Aaccount with twenty years experience in determining damages in commercial litigation.  Carter is a founding member of Ocean Tomo, LLC., "an intellectual capital merchant banc firm providing valuation, asset and risk management, corporate finance and expert services."  Carter's education and work experience qualifies him as an expert in damages assessment.

  With regards to Defendants' arguments on Carter's lost profit analysis, Carter examined total sales for the '716 patent and i>Clicker dating to 2008.  Carter then analyzed the relevant available audience response systems, distinguished those he determined to be commercially unacceptable alternatives due to slow response times, limitations in number of handheld units and reliability.  Included in his analysis on acceptable alternatives is Carter's reliance, in part, on Defendants' CEO's representations why the i>Clicker was gaining market share at the expense of such competitors as eInstruction.  Carter further opined that due to the alleged similarity of

design of the i>Clicker and Plaintiffs' device, their inherent improved response time sets them apart from other competitor's devices as evidenced by their increased market share in the last several years.  While Defendants argue against some of these exclusions, Defendants challenges do not sufficiently rebut the reliability of Carter's conclusions to warrant exclusion.  Rather, Defendants challenge Carter's assumptions that certain devices are, in fact, acceptable alternatives.  These challenges go to the weight accorded Carter's opinions and not the reliability of his methodology.  Carter further considered manufacturing capability (ECF 178-2 pg. 19) and marketing, finding Plaintiffs would have been able to provide their device to customers who bought the i>Clicker.  Carter also considered the i>Clickers lower cost in reaching his calculation of the sales Plaintiffs would have realized but for the alleged infringing i>Clicker.

Lastly, Carter examined a substantial list of factors to determine lost profits Plaintiffs would have realized but for Defendants alleged infringement.  He arrived at his figures by calculating price, market share, incremental costs, commissions, bonuses and a number of other factors to arrive at his calculation.  (See figure 14 & 16 ECF # 178-2.)  The Court finds Carter's lost profit analysis satisfies the *Paudit* factors, was made using sufficient facts and data and is the product of reliable principles and methods that would assist the trier of fact.  His opinions are certainly open to cross examination, but Plaintiffs have met their burden to show his testimony is admissible.

The same applies to Carter's royalty rate calculation.  In calculating a reasonable royalty, courts rely on the fifteen factors detailed in *Georgia–Pacific Corp. v. United States Plywood Corp.,* 318 F.Supp. 1116, 1120 (S.D.N.Y.1970).  These factors are considered in a hypothetical negotiation between the patent holder and a potential licensee to determine a royalty rate.  There

is no argument that Carter applied the fifteen factor test to arrive at a royalty rate of 8%. Carter considered among other things: (1) whether Plaintiffs had received any royalties for licensing its patent-in-suit to show an established royalty rate and found no licenses applied. The only comparator was an agreement between Turning and Responsive, which Turning's CEO deemed was not a real world licensing agreement but which Carter found to have similarities to a licensing agreement. (2) Rates paid by licensee for use of other comparable patents. Carter examined the asset purchase agreement wherein Defendant Holtzbrinck purchased the patent ultimately resulting in the i>Clicker. Carter considered the royalty rate found in that agreement in his analysis.

Carter determined which factors benefitted Plaintiffs and which benefitted Defendants, including profit margins and sales on the products sold by both Plaintiffs and Defendants and relative market share. Carter's 8% rate is derived from applying the factors and represents a percentage of the operating profit Carter calculated for the i>Clicker and the favorable position of Plaintiffs in a hypothetical negotiation based on his application of the *Georgia-Pacific* Factors.

Having reviewed Carter's Report and Defendants' objections, the Court finds Carter's opinions on a reasonable royalty rate were not the product of pure speculation but were arrived at after the appropriate consideration of the *Georgia-Pacific* factors and were based on facts and data which he reasonably applied using reliable methods.

Finally, Futuresource's reliability, while subject to cross examination, cannot be said to be unreliable simply because Plaintiffs' CFO and experts never heard of them, or because its market data is supplied by market participants. Defendants offer no evidence that

Futuresource's data is unreliable other than the above objections, which deal more in theory than in fact. There is nothing before the Court demonstrating the unreliability of Futuresource data. Furthermore, Carter analyzed Futuresource's data on his own, confirming its reliability by comparing Futuresource's data with Plaintiffs' own sales as well as those of Defendants. Therefore, the Court is satisfied that Futuresource's data is admissible and its consideration by both Plaintiffs and Defendants experts was not improper.

Therefore, for the foregoing reasons the Court denies Defendants' Motion to Exclude the testimony of Andrew Carter.

IT IS SO ORDERED.

s/ Christopher A. Boyko
CHRISTOPHER A. BOYKO
United States District Judge

Dated: March 25, 2014